THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| FRANCIS C. TUCKER, ) | Case No. 5:09-bk-914 |
| ) | |
| Debtor. ) | Chapter 7 |

## MEMORANDUM OPINION

On April 27, 2009, Ohio Valley Amusement Company ("OVA"), Alexas Intertainment, LLC ("Alexas") and Al Hart (collectively, the "Petitioners") filed an involuntary Chapter 7 petition against the alleged debtor, Francis C. Tucker. Tucker filed an answer contesting the petition, and two motions to dismiss. The court denied the motions to dismiss and held a trial[1] on the contested petition from June 1 through June 3, 2010.

Based upon the evidence and arguments presented by the parties, the court finds that the Petitioners have established grounds for relief under 11 U.S.C. § 303, and, accordingly, an order for relief will be granted.

## I. BACKGROUND

**A.    Relationships Among the Petitioners and Tucker**

**1.    Alexas and OVA**

From 1980 through 2006, Tucker operated a video lottery business. He organized OVA to hold the necessary licenses, equipment and real estate leases, and was OVA's president and sole shareholder. In February 2003, Tucker authorized OVA's Chapter 11 bankruptcy petition. The case lingered until 2007, when a group of investors doing business as H.E.B., LLC ("HEB")

---

[1]    Pursuant to Fed. R. Bankr. P. 1018, a contested involuntary petition is not treated as adversary proceeding, although several rules governing adversary proceedings apply in litigation regarding a contested petition. Nevertheless, the Bankruptcy Code uses the term "trial" in reference to the disposition of a contested petition. 11 U.S.C. § 303(h).

1

intervened. HEB formed Alexas as a special purpose entity to become a participant in the OVA bankruptcy case. Alexas gained control over the destiny of OVA by, among other things, purchasing claims against the OVA bankruptcy estate in order to promote a plan of reorganization. The plan, backed by a substantial infusion of capital by Alexas, was confirmed on December 14, 2007. The outstanding stock in OVA was canceled, and new stock was issued to Alexas (49%), Rodney Berry (2%), and Tucker's brother, Tom Tucker (49%), thus, leaving Tucker with no interest in OVA.

Upon confirmation of OVA's plan, and in accordance with its terms, Brad Singleton became the Chief Operations Officer and Vice President of OVA, overseeing the day-to-day management of OVA. The plan further stipulated that Alexas would provide management services to OVA.[2] Later, HEB sold its membership interests in Alexas to Singleton. Consequently, he participates in the management of OVA and holds a 49% ownership interest in OVA.

### 2. Al Hart

Hart has known Tucker for approximately nine years, dating from the time when Tucker began operating OVA's lottery equipment at Hart's bar. Eventually, Tucker hired Hart as a contractor for OVA to do collections and regular maintenance of its video lottery terminals. Hart has continued his work for OVA even after Tucker lost control over it. Although he performs services for OVA through an entity known as "Al's Amusements," he remains on call until about midnight every night to respond to OVA's customers.

## B. The Petitioners' Claims against Tucker

OVA's claim against Tucker arises from a March 27, 2002 promissory note (the "Northern Note") executed by Tucker on behalf of Mound City, Inc. ("MCI")[3] and OVA to

---

[2] Presently, Alexas subcontracts its management services to HEB, of which Mr. Singleton is an employee.

[3] Tucker was the president and a 50% shareholder of MCI, and it followed OVA into Chapter 11 bankruptcy in February 2003. MCI owned several developed pieces of real estate at various locations in which businesses operated using OVA machines. The OVA and MCI cases were administratively consolidated. However, only OVA proposed a plan of reorganization. Following confirmation of the OVA plan, MCI voluntarily dismissed its case.

2

Northern Hancock Bank ("Northern"). MCI and OVA both signed as borrowers on the Northern Note; additionally, Tucker signed a personal guaranty (the "Commercial Guaranty") for the borrowers' obligations to Northern.

OVA's Chapter 11 plan provided for OVA to "continue to be bound by its guarantee of the prepetition debts of Mound City, Inc. owed to Northern," but for Northern to receive no distribution under the plan. After confirmation, Northern filed a complaint in the Circuit Court of Hancock County, West Virginia, seeking a judgment against MCI, OVA and Tucker, jointly and severally, for the amount due on the Northern Note. On March 18, 2009, Northern executed an assignment of the state court action, which recites that Northern had already assigned its rights in the Note and collateral to OVA. On the same date, Northern's president, Mark A. Mangano, signed a written statement asserting that Northern assigned all of its rights in the Northern Note to OVA. The petition alleges that OVA holds a $258,034.84 claim against Tucker based on the Commercial Guarany.

In addition, Tucker owes OVA $5,021.11 based on an award of sanctions issued by this court on March 31, 2009 due to Tucker's failure to attend a scheduled deposition.[4]

Alexas acquired its claims against Tucker in conjunction with its acquisition of claims in the OVA bankruptcy case. Tucker's personal obligations on OVA's corporate debts resulted in three judgments against him: two in favor of Summit Amusement & Distributing, Ltd. and one in favor of Firestone Financial Corporation. Another entity, M.L.H., LLC, ("MLH") acquired the Firestone & Summit judgments, and transferred the judgments to Alexas by notarized documents memorializing the assignments. The three judgments total $1,432,623.23, and are entitled to interest at an annual rate of 10%.

Hart's claim against Tucker is based upon an oral agreement by which he loaned $10,000 to Tucker.

## II. DISCUSSION

---

[4] OVA did not include this debt in the petition, but the Petitioners moved the court to permit the petition to be amended in order to conform with the evidence. The motion was granted.

Tucker contends that the Petitioners' involuntary petition against him should be dismissed on three grounds: (A) the Petitioners do not hold qualified claims against him, (B) he is generally paying his debts when due, and (C) the Petitioners filed the involuntary petition in bad faith.

**A.    Section 303(b) – Qualification of Claims**

Tucker argues that: (1) the claims of Alexas, OVA, and/or Hart are either contingent or subject to a bona fide dispute as to liability or amount; (2) the court should treat Alexas and OVA as the same entity; and (3) the Petitioners do not meet the $13,475[5] unsecured debt threshold needed to file an involuntary petition.

**1.    Not Contingent & Not the Subject of a Bona Fide Dispute**

Tucker asserts that Alexas's claim is subject to dispute as to the amount, and that the assignments of the Firestone and Summit judgments to Alexas was improper. He contends that OVA's guaranty claim is contingent on the grounds that OVA has not made a demand for payment on him, and that OVA's claim is disputed due to inconsistent allegations as to the amount owed, a failure to obtain a proper assignment of the guaranty, its failure to account for personal property securing the guaranty, and for post-petition satisfaction of the amount due. Tucker claims that the $10,000 oral loan to Hart is disputed and/or contingent on the basis that Hart never made a demand on him for payment.

Section 303(b) of the Bankruptcy Code authorizes the filing of an involuntary Chapter 7 petition by creditors who meet certain qualifications. To join an involuntary petition, a creditor must hold a claim that is not "contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1). For a petition against a debtor with 12 or more qualified creditors, § 303(b)(1) requires that at least three such creditors join the petition; and, the aggregate of the qualified claims of the petitioners must exceed the value of any liens securing those claims by $13,475.

---

[5]    This dollar amount was adjusted to $14,425 on April 1, 2010, pursuant to 11 U.S.C. § 104(a). Because "[a]djustments made in accordance with [§ 104(a) do] not apply with respect to cases commenced before the date of such adjustments," the court uses the $13,475 threshold amount in effect as of the petition date in this case. 11 U.S.C. § 104(c).

4

The two creditor qualification criteria – not contingent as to liability or the subject of a bona fide dispute as to liability or amount – are defined by case law. The following formulation is widely accepted as the standard used for determining whether a claim is contingent under § 303(b):

> [C]laims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor at the time the event giving rise to the claim occurred.

*In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980); *see also Holland v. DePaulis (In re DePaulis)*, No. 3:07cv75, 2008 U.S. Dist. LEXIS 74396, at *16-17 (W.D.N.C. Sept. 26, 2008); *Brockenbrough v. Commissioner, IRS*, 61 B.R. 685, 686 (W.D. Va. 1986); *In re Local Communs. Network, Inc.*, No. 07-12433, 2008 Bankr. LEXIS 14, at *8 (Bankr. E.D. Va. Jan. 2, 2008); *In re Gills Creek Parkway Assocs., L.P.*, 194 B.R. 59, 62 (Bankr. D.S.C. 1995); *In re Galaxy Boat Mfg. Co.*, 72 B.R. 200, 203 (Bankr. D.S.C. 1986).

Regarding the term "bona fide dispute," the Court of Appeals for the Fourth Circuit holds that "a bona fide dispute requires an objective basis for either a factual or a legal dispute as to the validity of the debt." *Platinum Fin. Servs. Corp. v. Byrd (In re Byrd)*, 357 F.3d 433, 437 (4th Cir. 2004) (internal quotation marks omitted). "The bankruptcy court need not resolve the merits of the bona fide dispute, but simply determine whether one exists." *Id.*

The initial burden rests on the petitioning creditors to establish a prima facie case that their claims are not contingent and that no bona fide dispute exists regarding such claims. *Id.* Once the prima facie case is established, the burden then shifts to the debtor to show that the claims are contingent and/or that a bona fide dispute exists. *Id.* at 439.

      a.    *Alexas*

Tucker claims that the $1,432,623.23 in judgment liens against him that were obtained by Alexas from Firestone and Summit are in dispute due to: (1) Alexas's assertion of two different amounts being owed, and (2) Alexas's alleged failure to obtain a valid assignment of the Firestone and Summit judgments.

Tucker admitted that the Firestone & Summit Judgments were entered against him, explained that the bases for the judgments were his personal obligations on purchase money

5

loans for OVA's equipment, testified as to the approximate months in which the judgments were entered, when proceedings in aid of execution on those judgments were carried out against him, and conceded the approximate amount of the judgments. The judgments are final – unappealed and unstayed – and execution proceedings had been initiated before the filing of this involuntary petition; thus, Tucker's liability on the judgments depends upon no future occurrence. Accordingly, Alexas established its prima facie case that the Firestone & Summit judgments are neither contingent nor the subject of a bona fide dispute.

Tucker makes two arguments to show that Alexas's claims are in dispute, but both lack merit. First, Tucker asserts that the amount owed to Alexas is in dispute because the $1,468,161.54 figure appearing on the petition is different from the $1,432,623.23 figure that was presented at the hearing. The Petitioners contend that the difference results from a mistake that was made by them in listing the claim of Alexas on the petition. Instead of listing $222,461.53 representing one of the judgments it derived from the Summit assignment, Alexas listed in its place the figure of $258,034.84, which also happens to be the exact amount of OVA's claim against Tucker. Due to this discrepancy, at trial, the Petitioners moved, over the objection of Tucker, to amend the petition in order to conform it to the evidence presented regarding the amounts of the judgments constituting the claim of Alexas.

The court reserved ruling on the motion of the Petitioners to permit the parties to submit argument and legal authority on the issue in conjunction with post-trial briefing. The court now grants the Petitioners' motion in accordance with Fed. R. Bankr. P. 7015(b)(1). Amendments to pleadings in order to conform to the evidence are to be freely granted when doing so will promote the merits of a case and the objecting party fails to show prejudice. Here, presentation on the merits is fostered by granting the motion because the amendment merely corrects a mistake in listing the amount of a judgment that is otherwise undisputed; a judgement in the amount of $222,461.53 that is fixed and final, and was rendered against Tucker years ago. Conforming the petition to adopt the correct figure doesn't prejudice Tucker, nor has he advanced such an argument. In fact, the judgments which Alexas relies upon were set forth in its Statement Pursuant to Rule 1003 that was filed simultaneously with the petition.

Second, Tucker asserts that there is a dispute as to whether Alexas obtained a valid assignment of the Firestone & Summit judgments, because, while Alexas obtained its claims in

6

conjunction with the OVA case in August of 2007, the judgment assignments filed in this case were not signed until February 3, 2009, and, between those dates, collection proceedings were carried out in the names of Firestone and Summit as late as 2008.

Tucker's second argument, however, overlooks the purpose of the February 3, 2009 assignments, which was to facilitate collection by Alexas on the judgments it thought it had already obtained by an earlier assignment. Frank B. Barker is the sole member of MLH which was the entity initially used by HEB to purchase claims in the OVA bankruptcy proceeding for the ultimate purpose of transferring them to Alexas. MLH obtained the Firestone and Summit Judgments by written assignments on August 10, 2007. At the same time, MLH also purchased the claims of Firestone and Summit which were filed in OVA's bankruptcy case. According to Barker's testimony, the judgment assignments and bankruptcy claims were to be transferred to Alexas in conjunction with the development of OVA's plan of reorganization. Although it appears from the record in the OVA case that the bankruptcy claims were transferred to Alexas, apparently, in the words of Barker "someone dropped the ball" by failing to have written assignments of the judgments drawn up and executed. Barker then explained the time discrepancy between Alexas's claims acquisition in the OVA case and his execution of the Judgment Assignments. According to Mr. Barker, the attorney hired to pursue the Firestone & Summit judgments on behalf of Alexas needed judgment assignments for recordation purposes. Thus, as Mr. Barker succinctly and credibly explained, he agreed to execute the assignments for the benefit of MLH's assignee, Alexas.

The fact that collection activity was carried out in the names of Firestone and Summit in 2008 is not inconsistent with Alexas obtaining an assignment of the judgments as early as 2007. An assignee of a right may pursue the assigned right in the name of the assignor or in the assignee's own name. W. Va. Code § 55-8-9; *Cook v. Eastern Gas & Fuel Assocs.*, 39 S.E.2d 321, 326 (W. Va. 1946).

Moreover, even if Alexas first obtained an interest in the judgments on February 3, 2009, its claim is not in dispute. Alexas presented copies of notarized assignments from Firestone to MLH, signed on August 10, 2007, and from Summit to MLH, signed on August 18, 2007. The same judgments described in the August 2007 assignments to MLH are described in the judgment assignments to Alexas signed by MLH on February 3, 2009, which is earlier than the

7

petition date. Regardless of what transpired before February 3, 2009, Alexas established that it obtained the judgment assignments before it signed the petition against Tucker.[6] Thus, its entitlement to assert the Firestone & Summit judgments in this proceeding is not the subject of a bona fide dispute.

### b. OVA

Tucker contends that the $258,034 guaranty claim held by OVA is contingent on the grounds that OVA has not made a demand on him for payment, and is in dispute on the basis that: (1) OVA has made two different allegations as to the amount due; (2) OVA did not produce a separate written assignment of the guaranty claim; (3) OVA did not account for personal property secured by the guaranty claim; and (4) OVA did not reduce the amount of its guaranty claim to account for two post-involuntary petition foreclosures of real property securing the guaranty claim.

A guaranty of payment is "an absolute guaranty . . . by which the guarantor unconditionally promises payment or performance of the contract on default of the principal debtor. It is further said that a guaranty is deemed to be absolute unless its terms import some condition precedent to the liability of the guarantor." *Esso Standard Oil Co. v. Kelly*, 112 S.E.2d 461, 465 (W. Va. 1960). By contrast, a guaranty of collection, which may also be in the form of an absolute guaranty, creates no obligation on the part of the guarantor to pay only after the creditor fails to collect from the primary obligor. *Middle States Loan, Bldg. & Constr. Co. v. Engle*, 31 S.E. 921, 923 (W. Va. 1898); *Restatement (Third) of Suretyship & Guaranty*, § 15 (1996).

Here, the following provisions contained in the Commercial Guaranty show that Tucker is a payment guarantor:

> AMOUNT OF GUARANTY. This is a guaranty of payment of the Note, including without limitation the principal Note amount of Two Hundred Seventy-six Thousand Eight Hundred Fifty-four & 50/100 Dollars ($276,854.50).

---

[6] Tucker also asserted that the assignment of the Firestone and Summit judgments to Alexas was improper on the grounds that the sole purpose of the assignment was for commencing this involuntary case. In light of Barker's uncontroverted testimony, there is no evidence to support Tucker's assertion.

8

GUARANTY. For good and valuable consideration, Francis C. Tucker ("Guarantor") absolutely and unconditionally guarantees and promises to pay to NORTHERN HANCOCK BANK & TRUST COMPANY ("Lender") or its order, on demand, in legal tender of the United States of America, the Indebtedness (as that term is defined below) of MOUND CITY, INC.; and OHIO VALLEY AMUSEMENT CO ("Borrowers"), or either or any of them, to Lender on the terms and conditions set forth in this Guaranty.

Tucker argues that the claim is contingent because OVA never made a demand for payment from Tucker. The Commercial Guaranty, however, contains no limitations on the absolute nature of Tucker's payment guaranty, and further waives the guarantor's rights to demand presentment, notice of nonpayment of the Note before collecting from the guarantor, and demand that the Note holder proceed directly against the primary obligors or collateral before collecting from the guarantor. Demand for payment is not a condition of a payment guarantor's liability on the guaranty. *E.g.*, *Esso Standard Oil Co.*, 112 S.E.2d at 465 (W. Va. 1960) (stating that the only condition on an absolute guaranty is the default of the primary obligor). There is no dispute that MCI and OVA defaulted on the Northern Note, and there is no dispute that the Commercial Guaranty relates to the Northern Note. Because Tucker is a payment guarantor, the court finds that OVA has carried its burden of proof in showing that its claim under the Commercial Guaranty is not contingent under § 303(b).

Tucker makes four arguments to support his contention that OVA's claim is the subject of a bona fide dispute. First, Tucker asserts that the amount claimed as being owed to OVA is in dispute because the $258,034.84 figure appearing on the petition is different from the $251,357.68 figure that was presented at the hearing. This discrepancy presents a dispute as to whether the OVA claim must be disregarded because the amount of its claim might be considered in dispute. The better reasoned authority suggests that a petitioning creditor is not disqualified even if a bona fide dispute exists regarding a *portion* of its claim. *In re DemirCo Holdings, Inc.*, No. 06-70122, 2006 Bankr. LEXIS 1131 (Bankr. C.D. Ill. June 9, 2006) (rejecting the debtor's argument that a dispute as to any amount made the creditor's entire claim subject to a bona fide dispute), 2 *Collier on Bankruptcy* ¶ 303.11[2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). Thus, the fact that a portion of OVA's claim may be in dispute – here,

9

a discrepancy of less than $ 7,000[7] – does not render the remaining portion from qualifying as a claim when otherwise established by the evidence. In other words, Tucker's argument does not create a bona fide dispute as to the lesser amount established.

Second, Tucker argues that OVA has no rights under the Commercial Guaranty because it did not present proof of a separate written assignment of the Commercial Guaranty along with the Northern Note.

Under West Virginia law, no writing is required to effect the assignment of a contractual right. *Wilt v. Huffman*, 33 S.E. 279, 280-281 (W. Va. 1899); *Scraggs v. Hill*, 17 S.E. 185, 187 (W. Va. 1893). An 'assignment' of a right is a manifestation of the assignor's intention to transfer such right, by virtue of which transfer the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." *Boarman v. Boarman*, 556 S.E.2d 800, 803 (W. Va. 2001) (citing *Restatement (Second) of Contracts* § 317(1) (1981)). "Unless required by statute or by contract, the assignor of a right may make an assignment by manifestation of intention to transfer, without any particular formality." *Id.* (citing *Restatement* § 324 cmt. a.). While the Uniform Commercial Code requires written evidence of a contract for the sale of goods for $500 or more, failure to satisfy the writing requirement does not render a sale "void for all purposes, but merely prevents it from being judicially enforced in favor of a party to the contract." W. Va. Code § 46-2-201 cmt. 4. Moreover, third parties to a contract of assignment, including the obligor of an assigned right, cannot take advantage of the Statute of Frauds. *Restatement* §§ 144 cmt. d. & 324 cmt. b.

Here, OVA established that Northern intended to transfer its rights in the Northern Note and the Commercial Guaranty to OVA. OVA presented the testimony of Mark A. Mangano, who is the current president of Northern and who authorized Northern's assignment to OVA. Mr. Mangano testified that he delivered the Commercial Guaranty to OVA along with the Northern Note, with the intention that OVA would obtain Northern's rights in both instruments.

---

[7] Actually, $5,021.11 should be added to the figure of $251,357.68 based on the amendment to the petition adding the discovery sanctions award to OVA before it filed this involuntary petition. *See footnote* 4, *supra*, and accompanying text. Thus, the difference is much less than $7,000; to be precise, it's $1,756.05.

To make Northern's intention abundantly clear, Mr. Mangano signed the following statement a few weeks before the final hearing in this proceeding:

> On March 18, 2009, Northern Hancock Bank & Trust Company transferred, sold and assigned to Ohio Valley Amusement Co., Inc. all of its rights, title and interest to Note Number 6098754 which transfer, sale and assignment included all rights, title and interest of Northern Hancock Bank & Trust Company to the Commercial Guaranty executed by Francis C. Tucker.

(Creditors' Ex. 95.)

Consequently, Northern intended to relinquish its rights on March 18, 2009; thus, OVA's entitlement to enforce the Commercial Guaranty pursuant to its assignment from Northern is not the subject of a bona fide dispute.

Third, Tucker argues that the amount of OVA's claim is in dispute because it is secured by personal property that has not been accounted for by OVA. However, partially, and even fully secured creditors, can be petitioning creditors. A secured creditor that has no unsecured claim is not prevented from being a petitioning creditor; it merely means that the remaining petitioning creditors must aggregate at least $13,475 in noncontingent, undisputed, unsecured claims. *In re Evans*, No. 96-21180, 1997 Bankr. LEXIS 1073, at *36 (Bankr. E.D. Va. June 6, 1997); 2 *Collier on Bankruptcy* ¶ 303.12[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010). Thus, while Tucker's argument might be relevant with respect to whether any portion of OVA's claim can be used to meet the threshold amount regarding unsecured claims, it does not show that OVA's claim is the subject of a bona fide dispute.

Fourth, Tucker contends that the amount of OVA's claim is in dispute on the grounds that OVA failed to reduce the principal balance on its claim in the petition to reflect the foreclosure of two parcels of real estate collateral that occurred after the filing of the involuntary petition. A bankruptcy court determines a creditors standing under § 303(b) as of the date the petition is filed. *See Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir. 1988) ("Post-petition payment of a debt does not affect whether the debt is subject to a bona-fide dispute."). Here, both of the foreclosure sales to which Tucker refers occurred post-petition,

11

which does not bear on whether OVA's claim was the subject of a bona fide dispute as to liability or amount as of the petition date.[8]

### c.     *Hart*

Hart's claim is based upon an oral agreement to loan Tucker $10,000 and for Tucker to repay the loan. The testimony of both Hart and Tucker revealed that no written memorialization of the loan agreement exists and that Hart did not require Tucker to pay interest on the loan.

A loan is a contract where "one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form." *United Virginia Factors Corp. v. Aetna Casualty & Surety Co.*, 624 F.2d 814, 816 (4th Cir. 1980).

Hart testified that he made the loan to Tucker during August 2007, and that Tucker promised to repay the loan after January 1, 2008. According to Hart, Tucker promised to be able to repay the loan once Tucker sold some real estate. During Tucker's testimony, he acknowledged that he accepted the loan from Hart and gave his promise to repay the loan after January 1, 2008. The court finds that Hart carried his burden in proving that he and Tucker entered into a loan contract, including a promise by Tucker to repay the loan after January 1, 2008. Hart's right to payment under the terms of the loan commenced after January 1, 2008, a date which has come and gone. Because Hart's claim depends upon no future occurrence, the court finds that his claim is not contingent.

Tucker argues that the loan to Hart is the subject of a bona fide dispute on the grounds that the loan amount is not due because Hart never demanded payment from Tucker. Hart's demand, however, was not a condition of Tucker's obligation to repay. The testimony is clear that Hart was entitled to payment beginning on January 2, 2008. Thus, the court finds that Hart holds a claim that is not the subject of a bona fide dispute.

---

[8]     Regardless of when the court measures OVA's claim, the foreclosure sales were not sufficient to satisfy OVA's claim against Tucker. OVA established that the amount due as of the date of the petition is $251,357.68, excluding interest. OVA credit bid at the post-petition foreclosure sales $125,000 to obtain title to the collateral. Netting the costs of sale, OVA's claim decreased by a total of $120,343.84, leaving a substantial balance owed on the Northern Note.

12

Because all three of the petitioning creditors hold qualified claims, § 303(b)(1) applies, and, thus, the court need not address whether Tucker has fewer than 12 qualified creditors under § 303(b)(2). However, Tucker advances another argument for the application of § 303(b)(2) which must be addressed.

### 2. OVA and Alexas Counted Separately

Tucker argues that OVA and Alexas are alter egos, and they should be counted as a single creditor, which, in effect, would require that the Petitioners prove that Tucker has fewer than 12 creditors under § 303(b)(2). Tucker, however, failed to prove his theory.

To establish that Alexas and OVA should be counted as one entity for purposes of standing to file the involuntary petition, Tucker must pierce the corporate veil under state law. As long as "the creditors have maintained their separate identities in accordance with state corporate law, consolidation [through veil piercing] should not be permitted." 2 *Collier on Bankruptcy* ¶ 303.14. Applicable state law provides the standard for consolidation by veil piercing. *E.g.*, *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 218 (5th Cir. 1993) (applying state law on veil piercing in determining whether to consolidate claim holders); *In re Henry S. Miller Commercial, LLC*, 418 B.R. 912 (Bankr. N.D. Tex. 2009). Under West Virginia law:

> Decisions to 'pierce' involve multifarious considerations, including inadequacy of capital structures, whether personal and corporate funds have been commingled without regard to corporate form by a sole shareholder, whether two corporations have commingled their funds so that their accounts are interchangeable; whether they have failed to follow corporate formalities, siphoning funds from one corporation to another without regard to harm caused either entity, or failed to keep separate records. Other reasons to disregard the structure are: total control and dominance of one corporation by another or a shareholder; existence of a dummy corporation with no business activity or purpose; violation of law or public policy; a unity of interest and ownership that causes one party or entity to be indistinguishable from another; common shareholders, common officers and employees, and common facilities.

*Southern Elec. Supply Co. v. Raleigh County Nat'l Bank*, 320 S.E.2d 515, 523 (W. Va. 1984). These factors must be coupled with "evidence that a corporation attempted to use its corporate structure to perpetrate a fraud or do grave injustice on an innocent third party." *Id.* The alter ego doctrine "is complicated and applied gingerly." *Id.* at 522. "The law presumes that two

separately incorporated businesses are separate entities and that corporations are separate from their shareholders." *Id.*

Here, at best, Tucker showed that Alexas and OVA share an officer, Mr. Singleton; that Mr. Singleton is the sole shareholder of Alexas; and that Alexas owns 49% of the shares of OVA. While the two entities are clearly connected through Singleton's interests, "nothing . . . prohibits one man or group from starting or owning two separate corporations with common purposes." *Id.* at 524. Moreover, the evidence showed that while Singleton exercises considerable discretion in managing the financial affairs of OVA in his role as COO and as HEB's employee under its subcontract for management services with Alexas, Tom Tucker, CEO of OVA and Tucker's brother, also exercises considerable discretion regarding the non-financial operations of OVA, including taking care of, in his words, "the nuts and bolts" of its daily business affairs. Additionally, he testified convincingly that he is well aware of his duties and responsibilities as CEO, which he has exercised independently – albeit it, reluctantly – even when it has caused considerable discord within his familial relationships.

In short, Tucker failed to muster sufficient proof regarding any of the several elements necessary to establish that OVA and Alexas are alter egos, let alone furnish proof that the corporate structures were used to perpetuate a fraud or for the purpose of subverting justice, such as manufacturing an artifice regarding the three creditor requirement of § 303(b)(1). Thus, the courts finds that OVA and Alexas hold distinct claims against Tucker, and each has independent standing as a petitioning creditor in this case.

### 3. $13,475 Minimum Threshold

The aggregate amount of all claims must exceed the "value of any lien on property of the debtor" by at least $13,475. 11 U.S.C. § 303(b)(1).

Here, Mr. Hart has a $10,000 unsecured claim against Tucker. Alexas holds three judgments totaling $1,432,623.23, not accounting for accrued interest. Tucker testified that he owns no real property upon which the judgments held by Alexas may be secured. Consequently, the Petitioners meet the $13,475 unsecured debt threshold under § 303(b)(1).

### B. Section 303(h)(1) – Generally Not Paying

Tucker contends that he is generally paying his debts when due on the grounds no demand for payment of his debts has been made by his creditors.

14

An order for relief under 11 U.S.C. § 303 can be entered only if it is determined that the putative debtor is "generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h)(1). The burden of proof is on the creditors to establish that as of the petition date Tucker was generally not paying his debts when due under § 303(h)(1). *In re Caucus Distributors, Inc.*, 83 B.R. 921, 930 (Bankr. E.D. Va. 1988); *In re Galaxy Boat Manufacturing*, 72 B.R. at 203 ("'The 'generally not paying' test is to be applied as of the date of filing of the involuntary petition . . . .'") (quoting *In re Bishop, Baldwin, Rewald, Dillingham*, 779 F.2d 471, 475 (9th Cir. 1985)).

The standard under § 303(h)(1) is a flexible one that "requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts. A court must compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of nonpayment, and the nature of the debtor's conduct of its financial affairs." *In re Caucus Distributors, Inc.*, 83 B.R. at 930 (internal citations and quotation marks omitted).

The following five factors provide, as a starting point, a "mechanical test" for determining whether a debtor is generally not paying his debts as they come due:

> [1] The timeliness of payments on past due obligations;
> [2] The amount of debts long overdue;
> [3] The length of time during which the debtor has been unable to meet large debts;
> [4] Any reduction in debtor's assets; and
> [5] The debtor's deficit [financial] situation.

*In re Knoth*, 168 B.R. 311, 316 (Bankr. D.S.C. 1994) (quoting *In re Galaxy Boat Manufacturing*, 72 B.R. at 203); *see also In re Caucus Distributors*, 83 B.R. at 930-931. "Although offering guidance, the mechanical test must be employed with regard to any unique circumstances attendant to a particular proceeding. The court must inquire whether the debtor's financial affairs are being handled in a manner consistent with good faith and in the ordinary course of business." *In re Knoth*, 168 B.R. at 316.

Here, regarding the first three factors, Tucker has never made a payment on the debts owed to the three Petitioners whose claims exceed $2.6 million, including interest. As of the

15

petition date, the majority of that debt had been due for over five years – a very long period. Moreover, as acknowledged by Tucker at trial, he was not making payments on any of his other debts whatsoever.[9]

In this regard, the court observes that, aside from the Petitioners, Tucker listed fourteen other creditors in his Debtor's Rule 1003(b) Creditor list. Ten of them are individuals – family or friends – who, according to Tucker's list and testimony at trial, made "personal" loans to him in varying rounded figures totaling $37,100, each of which was made to him without any accompanying terms or conditions, such as repayment dates, or documents, such as promissory notes.[10]

While Tucker states that no amounts are due on the notes because the individuals have not asked for payment, the notes reflect obligations of Tucker upon which no payment has been made. Given the informal nature of the personal loans, the court believes that the persons lending the money would be surprised to learn that Tucker is asserting that no amount is due. More plausible is that the loans were due as soon as they were issued, but the personal lenders are not actively seeking collection. The mere failure of a creditor to make a demand for payment doesn't excuse it from being a debt that is due within the meaning of § 303(h)(1). *In re West Side Community Hospital*, 112 B.R. 243, 256 (Bankr. N.D.Ill. 1990). Thus, the court concludes that Tucker is not paying these debts as due.

In addition to the debts not being paid as due to the Petitioners, and $37,100 in cash loans from various family members and friends, Tucker also included on his Rule 1003(b) list, and

---

[9] For instance, in answer to an interrogatory propounded by the Petitioners during pre-trial discovery, Tucker stated that he has paid no debts since January 1, 2003. Tucker acknowledged the answer at trial; however, he tried to qualify it by indicating that it should be interpreted as meaning that he has paid no debts to any *individuals*. The interrogatory in question asked Tucker to "[i]dentify all *persons* to whom you have repaid a debt (as defined in 11 U.S.C. Section 101(12)), in whole or in part from January 1, 2003 to the present . . . ." Tucker testified that he understood "persons" to mean only "individuals," not business entities. This element of Tucker's testimony is not credible. For instance, in the same set of interrogatories, Tucker lists the names of both individuals and business entities in response to two other requests for a list of "persons." Thus, the court is convinced that Tucker's interrogatory answer is a more faithful rendition of his dealings with his creditors than his trial testimony.

[10] The court heard testimony only from Tucker as to the loans, and the details in that regard were thin, at best.

16

testified at trial, to a debt owed to an attorney for $500, and $28,000 in credit extended by a lender and an equipment supplier for a new café business that Tucker is starting. Tucker acknowledged that these debts were not being paid. However, like the personal loans, Tucker testified that they are not due. The debt owed to the attorney suffers from the same shortcomings that the personal loans do. Thus, the court finds that, for purposes of § 303(h)(1), it is not being paid as due. As for the money extended to Tucker for his business venture, although Tucker testified that the obligations were reduced to writing, he offered no such documents into evidence and offered very few details regarding the transactional terms; including whether they were due. In the end they suffer from the same infirmities as do the other debts already addressed and the court can see no good reason as to why they should not also be considered unpaid and due. Even assuming that the new business venture debts were not due, their total amount is quite modest when compared to the amounts unpaid and due to the Petitioners and other creditors.

Regarding the fourth and fifth factors, Tucker's assets have clearly been reduced and his deficit financial situation has worsened, but by his own design.[11] There is reason to believe that Tucker has been engaged in a game of hide-and-seek with his creditors. For instance, Tucker and his son each owned 50% of the stock of MCI. Tucker testified that in 2008, following confirmation of OVA's Chapter 11 plan, he transferred his stock in MCI to his mother, and that, at the same time, his son transferred his shares to her. Although his mother became the sole shareholder in MCI, Tucker operates it. Additionally, within the same time frame, he transferred 192,000 shares of his stock in Virtual Health Technologies to Tucker & Tucker Enterprises (a business set up by Tucker in which his mother is the sole shareholder). Moreover, in 2008, he

---

[11]     The court reserved for post-trial consideration its ruling upon the request for admission into evidence of Petitioners's exhibits 1-59 (OVA Operating Reports), 60 (OVA General Ledger), 93 (OVA Account Analysis), and 94 (MCI Ledger). Tucker objected. The court sustains the objection. The exhibits were offered in support of testimony that attempted to show Tucker's misconduct in the course of his financial affairs, vis-a-vis his management of OVA and MCI from approximately 2003 through 2007. The court believes that for purposes the proceedings upon the involuntary petition alone, the relevance of the evidence, if any, is too remote from the petition date and too intertwined with Tucker's conduct of the corporate business affairs of OVA and MCI to be admissible. *See Boston Beverage Corp. v. Turner*, 81 B.R. 738, 747 (D. Mass. 1987).

17

caused twelve parcels of real estate to be conveyed from MCI to his mother for no consideration. Finally, as of the petition date, Tucker testified to earning $1,500 per month in commissions from MCI, but he reported only $2,200 on his 2009 federal income tax return, and admitted that he receives no other form of income. Despite the bleak picture on the asset side of his balance sheet, Tucker has been able to convince business entities to extend credit to him for the development of his café venture. Thus, his liabilities are increasing, while he has depleted his ownership in property.

In sum, the Petitioners have shown by a preponderance of the evidence that each of the relevant factors, as applied to this case, support a finding that Tucker was not paying his debts as those debts fell due. Echoing the general criteria set forth in *Caucas Distributors Inc.*, 83 B.R. at 931, the evidence shows that Tucker was not paying any of his undisputed and acknowledged debts as of the petition date, and that they fell due as of that time given their nature as shown by the facts and considered in light of the purpose of § 303(b)(1). In fact, there's no evidence to suggest that Tucker was meeting any regularly scheduled financial obligations against which his delinquencies could be measured. Moreover, the delinquencies were substantial in amount; the materiality of the nonpayment was significant; and Tucker conducted his financial affairs in a manner close in time to the petition date that was evasive and detrimental in regard to his creditors.

### C.   Petitioners's Good Faith

Tucker argues that the Petitioners filed their involuntary petition against him in bad faith on the grounds that they are using the involuntary petition as a collection device and to keep him out of business.

Section 303 notwithstanding, if requested, a court must determine whether an involuntary petition has been filed in good faith, and must dismiss a bad faith filing. *United States Optical, Inc. v. Corning, Inc. (In re United States Optical, Inc.)*, No. 92-1496, 1993 U.S. App. LEXIS 6960, at *9 (4th Cir. April 1, 1993); *Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 (4th Cir. 1993). "A filing is presumed to be in good faith, and the existence of bad faith must be proven by the debtor by a preponderance of the evidence." *U.S. Optical*, 1993 U.S. App. LEXIS 6960 at *9. The Fourth Circuit employs a combined approach to determine whether an involuntary petition has been filed in bad faith involving both an objective

standard that focuses on whether a reasonable person in the position of the creditor would have filed, and a subjective standard that examines the petitioner's motivation. *Id.* Moreover, no single factor is determinative; rather, a court must consider the totality of the circumstances. *Id.*

Tucker argues that OVA and Alexas filed the petition purely as a collection device. Tucker overstates the rule that debt collection is not a proper purpose of an involuntary petition. *See Atlast Machine & Iron Works*, 986 F.2d at 716 n. 11. The anti-collection rule, is intended to prevent a small number of recalcitrant creditors from holding a debtor hostage to the satisfaction of their own claims at the expense of the other creditors, who by virtue of the filing, become stalled in their collections by the automatic stay. *In re Tichy Elec. Co.*, 332 B.R. 364, 376-377 (Bankr. N.D. Iowa 2005). While "[f]iling an involuntary petition solely to protect one's own interest evidences bad faith, filing to insure payment according to the bankruptcy priority scheme does not." 2 *Collier on Bankruptcy* ¶ 303.16[2]; *see also In re Ex-L Tube, Inc.*, No. 06-42967, 2007 Bankr. LEXIS 402, at *14 (Bankr. W.D. Mo. Feb. 16, 2007) (no bad faith in filing "to get paid pursuant to the priorities established by the Bankruptcy Code").

Here, Tucker, by his own admission, has transferred assets out of the reach of his creditors. Objectively speaking, he has failed to show how invoking the bankruptcy court's jurisdiction to recover and liquidate property for his bankruptcy estate is not something that a reasonable person in the position of the Petitioners would attempt. Tucker's conduct of his financial affairs has rendered traditional state court collection remedies frustrating, if not impractical. Moreover, Tucker has not advanced any convincing reason why proceeding in bankruptcy court is not equally rational to proceeding in state court; especially given the previous bankruptcy proceedings involving OVA and MCI, and Tucker's intimate ties to both.

Regarding the subjective motivations of the Petitioners, the debt owed to Tucker's other creditors is negligible compared to the value of the claims of the Petitioners. Therefore, it cannot be gainsaid that the Petitioners seek to be paid more in bankruptcy than they would recover in a race against other creditors outside of bankruptcy. Their motives include a desire to recover fraudulent transfers and to initiate a liquidation of Tucker's property, which are both permissible uses of the bankruptcy process.

Tucker argues in additional support of his bad faith allegations that OVA and Alexas are using bankruptcy to keep him out of business. He asserts that they filed the involuntary petition

to impede him from emerging as their competitor in the video lottery business. However, Tucker's investment in his new video lottery venture is being made on the backs of his creditors, because each dollar Tucker invests in his new business is a dollar that is not paid to them. He is not entitled to force OVA and Alexas to wait for payment, any more than other creditors. Moreover, the value to OVA and Alexas in pursuing their claims far outweighs the speculative loss they might realize if Tucker is a competitor. Tucker has failed to show that their motivation in filing the petition was to eliminate Tucker as a competitor.

In sum, consideration of the totality of the circumstances – on both objective and subjective counts – fails to show that the involuntary petition was filed in bad faith.

### III. CONCLUSION

The three Petitioners in this involuntary bankruptcy case have established their standing under § 303(b)(1), as well as grounds for relief under § 303(h)(1). Therefore, an order for relief under Chapter 7 of the Bankruptcy Code is granted.

The court will enter a separate order consistent with this memorandum opinion.